[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This suit arises out of the sale of a business located at 419 Robbins Avenue, Newington, Connecticut, by the defendant corporation, Deli Cate, Inc., to the plaintiffs, Luis Calvo and his wife, Maria Calvo. Joseph P. Capenera, president of the corporation, has also been made a defendant on the basis of his allegedly false representations that are claimed to have induced the plaintiffs to purchase the business.
The complaint contains three counts: (1) common law fraud based on oral representations alleged to have been made by the defendants; (2) breach of contract with respect to two paragraphs of the written agreement of sale dated January 18, 1988; and (3) breach of an indemnification provision of that agreement.
The first count, in paragraph 3, alleges that, to induce the plaintiffs to purchase the business, "the defendants represented to the plaintiffs that the town of Newington permitted the cooking and baking of food on the premises, and the serving of patrons within the premises and that the business was, in fact, a delicatessen/catering service/grocery store." Initially, the defendants admitted this allegation in their answer to the complaint. At trial they requested permission to amend their answer in order to deny paragraph 3 on the ground that their former attorney, who prepared the CT Page 8834 original answer and whose license to practice has been suspended, had made a mistake. The court allowed the amendments, concluding that the answer admitting the misrepresentation was wholly inconsistent with the testimony offered by the defendants at trial, that the plaintiffs had not been prejudiced in preparing their case, and that the defendants should not be bound by a judicial admission resulting from the mistake or incompetence of their former counsel on the central issue of the case. The plaintiffs cannot have been surprised by the amendment, because the pre-trial memorandum filed by the defendants' present counsel on November 28, 1990, almost two years before trial, stated: "The defendants deny that they made any such representations, but claim that they expressly informed the plaintiffs about the dispute with town officials concerning this use of the premises." Also, the disclosure of defense filed by the defendants' prior counsel on June 13, 1988, stated inter alia that "the plaintiff knew of this (zoning) restriction prior to the conveyance of title to the business.
The amended answer filed by the defendants after the close of trial, denied not only paragraph 3 of the first count, as expressly permitted by the court, but also denied entirely paragraphs 4 and 5 of that count, which the defendants had previously denied or left the plaintiffs to prove, except for denying that the plaintiffs had relied on the alleged representations. These modifications are of no consequence and the plaintiffs' written objection to the amended answer of the defendants does not refer to them.
The plaintiffs did object, however, to the change from an admission to a denial of paragraph 4 of the second count, which is repeated in the third count. This paragraph alleges: "In all statements and representations made by Defendant Deli-Cate, Inc., the material fact that the plaintiffs would not be permitted to operate the business as a restaurant business was omitted." The testimony of the defendants' witnesses that a copy of the certificate of occupancy prohibiting consumption of food on the premises was given to the plaintiffs was at variance with the defendants' original admission of this paragraph, but no objection was raised CT Page 8835 to such testimony. The plaintiff had been informed of the defendants' claim concerning delivery of a copy of the certificate of occupancy by the pre-trial memorandum of November 20, 1990, and, therefore, cannot claim surprise from this amendment of the answer. The court is convinced that these amendments to the defendants' answer have not prejudiced the plaintiffs in their preparation for the trial of the case and that it is better to resolve the case on the basis of the evidence at trial rather than the inadvertence of defendants' former counsel.
After weighing the conflicting evidence at trial, the court has found the following facts. On January 29, 1987, the defendant corporation, acting by its president, the defendant Joseph Capenera, leased the premises at 419 Robbins Avenue, Newington, from its owners for a two year term commencing March 1, 1987, with an option to renew for three years and an additional renewal option for five years. The lease restricted the use of the premises to a "grocery/delicatessen store" and required written consent of the lessors for any other use. (Ex. 2). The leased premises were located in a business zone under the Newington zoning ordinance, but the surrounding area is residential. The rear portion of the building in which the leased premises were situated was used for another business operated by one of the owners. The previous tenant had operated a grocery store/delicatessen there known as Lach's Market, but the store had been vacant for about a year. Among other items for sale by that business establishment were hams and turkeys cooked on the premises.
Both the defendant Joseph Capenera and his wife, Nancy Capenera, who was involved in his business operations, had previous experience in operating a delicatessen business and had also operated a restaurant that specialized in banquets, weddings and showers. They took possession after signing the lease and purchased and installed equipment needed to operate the business, using the name "Deli Cate" to indicate the nature of the business as a grocery/delicatessen store that also did catering off the premises. They paid about $11,000 for the equipment. Joseph Capenera attempted to install a ten burner electric stove in the store, but the Newington building officials would not permit it because the fire marshall disapproved. CT Page 8836
A controversy with the town officials arose concerning the issuance of a certificate of occupancy for the business. Joseph Capenera engaged an attorney to represent him in this matter. The attorney wrote a letter (Ex. 7) dated March 4, 1987 to Wayne Bell, a building official for the town of Newington whose duties included the issuance of certificates of occupancy. The letter claimed that 419 Robbins Avenue should be regarded as a nonconforming use, because it had been used as a grocery store/delicatessen for many years, and declared that Capenera wanted to continue to use the premises as a grocery store/delicatessen. A petition objecting to the store, which was signed by fifty residents in the area, was filed about this time with the Newington zoning authorities. After consulting with town counsel, Wayne Bell, on March 23, 1987, issued a certificate of occupancy (Ex. 5) for the use of 419 Robbins Avenue as a "Grocery store including the incidental sales of delicatessen products," subject to two conditions: "There shall be no baking, cooking or food consumption in or on the premises. This certificate shall be interpreted as a continuation of the original use of the premises." A further restriction was imposed on signs to be located on the exterior of the building. The certificate is confusing in that it refers the property as located in a "Business Zone" but also as "situated in a Spot Zone in a Residential Use District."
The Capeneras opened their store in April, 1987. They installed a four-burner electric stove instead of the ten-burner stove they had been denied permission to use. In July, 1987, they placed eight 30" x 30" tables with accompanying chairs in the front area of the store. Their son, Ralph Capenera, owned the tables and chairs and had used them when he was operating a cocktail lounge in the banquet facility that they had previously operated. Ralph wanted to sell the tables and chairs, and a sign was placed on a wall indicating that they were for sale. Wayne Bell, the building official observed these tables and chairs when he inspected the premises in the summer of 1987. When Bell inquired about them, Joseph Capenera explained that he did not intend to use them in his business and that they had been used in the previous business he had operated. Bell also observed CT Page 8837 during this inspection the four-burner stove and a food warmer, called a Bain-Marie, used to prepare hot grinders and other hot foods, but he raised no objection to the use of this equipment. He did inform Capenera of the restriction against on-premises food consumption in the certificate of occupancy. In this and other visits to 419 Robbins Avenue, Bell never observed any use being made of the tables or any consumption of food on the premises. He also never observed any cooking activity in his several visits. He did, however, read to Capenera the restriction against cooking stated in the certificate of occupancy during a visit in July or August, 1987, after receiving a complaint about catering activities on the premises. Bell testified that the shelves in the store were adequately filled with various grocery items.
Based upon his attorney's advice, and his knowledge of the business conducted by Lach's Market, Joseph Capenera believed he was lawfully entitled to do some light cooking on the premises for off-premises consumption. In addition to groceries and cold delicatessen items, he prepared and offered for sale some hot foods, such as ziti, spaghetti, eggplant parmesan, and hot grinder sandwiches. He estimated that hot foods comprised approximately five percent of his business volume. He also did some catering, also estimated at five percent of his total receipts, most of which involved the preparation of "party trays" with some hot foods, such as ziti. During his operation of the business, the store was open ordinarily from 9:00 or 10:00 A.M. to 5:00 P.M. Despite several visits by Bell to the store, Joseph Capenera was never ordered to cease any of his activities.
In November, 1987, Joseph Capenera decided to sell his business. He was not feeling well and he wanted to move to Florida. He engaged the O'Brien agency as a broker to find a buyer. The agency placed an advertisement in a newspaper that came to the attention of the plaintiffs, who had been looking for a small delicatessen business to purchase. They planned to have Marie Calvo operate the business during the day and Luis Calvo assume that responsibility after finishing his regular job at about 5:00 P.M. They had investigated the purchase of four or five similar businesses previously. CT Page 8838 They telephoned the O'Brien agency, which arranged a meeting with Joseph and Nancy Capenera at the store on Robbins Avenue.
The meeting took place in the late afternoon after the close of business. Luis and Marie Calvo brought their two young children with them. The children sat at one of the tables in the front part of the store drinking soda during the meeting. A representative of the O'Brien agency was also present, in addition to Joseph and Nancy Capenera, who customarily worked in the store with her husband. There was a general discussion of the operation of the business. Joseph Capenera said he operated a grocery store/delicatessen and that his delicatessen business included the sale of some hot food items, such as shells, ziti, meatballs, and hot grinders, that required cooking or warming. He also said that he prepared party trays as a caterer for some customers, including a religious school in Newington. The Calvos observed the equipment on the premises, which included the stove and food warmer. Joseph Capenera showed them his cash register receipts and offered to allow them to examine his financial records, but they were not interested. The meeting was relatively brief and the Calvos returned home without making any offer to purchase the business, for which the asking price was $25,000.
A few weeks after the first meeting the Calvos decided to offer $17,500 for the business at 419 Robbins Avenue, including the equipment. The broker from the O'Brien agency used a printed real estate contract form (Ex. 1) for this purpose, inserting the proposed purchase price of $17,500, the deposit of $500, and two conditions at the top of the form: "Subject to approval of loan from Conn. Nat'l Bank. Subject to approval of contract of Attorney Sward and Lease." A closing date of "on or before January 1, 1988" was written in. The Calvos apparently signed this document on November 21, 1987, as evidenced by the date next to their signatures, and the broker initialed the contract "JMB" as a witness. Joseph Capeneras also signed this document to indicate his acceptance of the offer, but no date appears next to his signature.
The parties met a second time in order to discuss CT Page 8839 the transaction and also to have the lessor-owners of the building in which the store was located become acquainted with the Calvos to whom the existing lease would be assigned. Consent of the lessors was required for an assignment of the lease. (Ex. 2). This meeting took place in the late afternoon or early evening at the store premises on some date between November 21, 1987 and January 18, 1988, when the transfer of the business occurred. (Ex. A). Joseph and Nancy Capenera, their son, Ralph Capenera, and Luis and Maria Calvo were present. Ralph Capenera, however, left the premises before the lessors or their representatives arrived.
During the discussion that transpired before the lessors arrived, Joseph Capenera told the Calvos about the dispute he had with the Newington zoning official concerning the certificate of occupancy at the time he had started his business. He showed them a copy of the letter (Ex. 7) that his attorney at that time had written to Wayne Bell, the zoning enforcement officer, in which the claim of nonconforming use was asserted. The Calvos were given a copy of the certificate of occupancy (Ex. 5) issued by Bell following his receipt of the attorney's letter and also received some pages of the Newington zoning regulations (Ex. 6) pertaining to uses and special exceptions permitted in business zones. Luis Calvo said that he would have his attorney investigate the zoning situation.
Either at this meeting or at the prior meeting, there was a discussion about the tables and chairs located in the front of the store, which belonged to Ralph Capenera. Maria Calvo stated that she intended to open the store at 7:00 A.M. and to serve coffee and Danish pastry. The Capeneras, however, pointed to the "for sale" sign and explained that the tables and chairs were owned by their son, Ralph, and that they could not be used for eating because no consumption of food on the premises was permitted. When the sale was later consummated, the tables and chairs were included with the other equipment being transferred. Joseph Capenera arranged with his son, Ralph, to allow the tables and chairs to be included in the sale for the same price because the broker had told him that the Calvos were insisting that they be included. CT Page 8840
During this meeting, two of the four lessors, Len and Lena Salodovnik, came to the store about 7:00 P.M., after Ralph Capenera had left. Apparently they represented the others for the purpose of the meeting. They met the Calvos and indicated that the lessors would consent to the lease assignment. There was an on-going dispute among the lessors, but apparently this did not implicate the lease. The terms of the lease were discussed, particularly the rent of $700 per month commencing March 1, 1988, and the possibility of renewal after expiration of the original two year term lease. There was no discussion of the lease provision restricting the use of the premises to a "grocery/delicatessen store."
The Calvos engaged Attorney James Sward to represent them in the purchase of the store in Newington after their first meeting with the Capeneras, but before the second meeting, at which no attorney was present. Luis Calvo expressly requested him to be sure that the lease was satisfactory and that Capenera owed no money to suppliers. He also asked his attorney to check out all aspects of the transaction, including zoning. There is no evidence of what Sward, who did not testify, may have learned about the zoning situation. He had no contact with Wayne Bell, the zoning enforcement officer, prior to the sale. Presumably he was aware of the lease restriction limiting use of the premises to a "grocery/delicatessen store."
On January 18, 1988, the closing took place, which the parties and their attorneys attended. An "asset purchase and sale agreement" (Ex. A) was executed. Joseph Capenera individually signed a covenant not to compete as part of this agreement. Len and Lena Solodovnik furnished a document (Ex. 3) indicating their consent to the lease assignment. The Calvos paid the purchase price from funds they obtained through a home equity mortgage loan on their home. From the funds received by the seller, Deli Cate, Inc., the sum of $3,500 was placed in escrow until a dispute among the lessors had been resolved or until February 28, 1989.
The Calvos opened the store for business on January 28, 1988, ten days after the closing. Maria Calvo would open the store at 8:00 A.M. and work there until CT Page 8841 approximately 4:30 P.M. and Luis Calvo would then operate the store until 10:00 P.M. They followed this schedule daily except on Sunday, when the hours were shorter. On February 17, 1987, the Calvos were notified of a claimed violation of the zoning regulations. They contacted Attorney Sward and a meeting was arranged at the store with Wayne Bell, the zoning enforcement officer. Bell, the Calvos, and Attorney Sward attended the meeting.
At the meeting, Bell showed the Calvos a copy of the certificate of occupancy. The Calvos said they had not seen it before and that they had believed they were entitled to conduct other activities in addition to operating a grocery store. Bell told them they would have to remove the tables and chairs from the store because they could not be used for food consumption on the premises. The court infers that the Calvos had been allowing customers to use the tables for eating in the store, and had been serving hot food, such as sausages and pasta. Although Bell pointed out the restrictions on cooking and baking in the certificate of occupancy, there is no evidence that he objected specifically to the sale of any food that required cooking or baking. He acknowledged that he was aware of the presence of the four-burner electric stove and the food warmer, but he never objected to their use. He was concerned primarily about serving food on the premises. He was also concerned with the decline in the use of the store as a grocery, because he observed that the grocery shelves were poorly stocked while the Calvos conducted the business.
After the meeting, the Calvos removed the tables and chairs from the store. They continued to sell hot food, however, using the electric stove and the food warmer. Some of this food was pre-cooked at their home and then warmed up in the food warmer at the store. They continued to sell such items as hot grinders, meat balls and ziti. All food was sold, however, only for consumption off the premises. They continued to do catering from the store, including such hot food as spaghetti, meatballs, ziti and sausage. (See Ex. 9, 10). The Calvos also investigated the possibility of a variance or a zone change in order to remove the restrictions contained in the certificate of occupancy. CT Page 8842 They, however, never actually filed an application for such a purpose.
On March 8, 1988, Attorney Sward, on behalf of the Calvos, obtained an ex parte prejudgment order for a $25,000 attachment of the home of Joseph Capenera in Wethersfield. The complaint with the prejudgment remedy documents were served on Capenera on March 19, 1988. Capenera was not aware of any claim against him by the Calvos until he received these papers. The Calvos continued to operate the business, despite the pending law suit, until September 30, 1988, when they closed it. They sold the equipment in the store to a dealer and received approximately $3,000 in the transaction.
 I.
The first count of the complaint alleges that the defendants represented that the town of Newington permitted (1) the cooking and baking of food on the premises; (2) the serving of patrons within the premises; and (3) "that the business was in fact a delicatessen/catering service/grocery store." The court's finding that Joseph Capenera gave the Calvos a copy of the certificate of occupancy containing the restrictions involved signifies that no misrepresentation was made with respect to either cooking and baking or serving food for consumption on the premises. They were fully informed of these restrictions by the copy of the certificate of occupancy that they received. They were also told expressly that no food could be consumed on the premises. With respect to the third representation, that the business was a delicatessen/catering service/grocery store, it is not disputed that Capenera described the business as a "grocery store delicatessen" or "grocery/delicatessen store," as stated in the lease, but this representation has not been proved false. Capenera also told the defendants that as part of his business he did some catering from the store and he mentioned specific customers for whom he had furnished food and services. This representation also has not been proved false. In fact, the plaintiffs continued to provide food as caterers until they closed the store. (See Ex. 9, 10). There was no attempt by the Newington zoning officials to interfere with the catering operations as CT Page 8843 conducted by either Capenera or the plaintiffs, nor is catering referred to in the certificate of occupancy. Wayne Bell did once talk to Capenera about a complaint relating to catering activities. Apparently, however, he confined his warning to the restriction against "cooking" in the certificate of occupancy, which Capenera interpreted to permit "light cooking", as he characterized his activities in preparing hot food. Bell was fully aware of the stove and food warmer on the premises and of the variety of hot food being sold for consumption off the premises by both Capenera and the plaintiffs. He never sought to enforce a total ban on cooking in the sense of preparing hot food to be taken out by customers because he recognized that there was some merit to Capenera's claim that such activities had previously been conducted by Lach's Market.
"It is well established that common law fraud must be proven by a higher standard than a fair preponderance of the evidence." Kilduff v. Adams, 219 Conn. 314, 327-32
(1991). Even if the normal "more probable than not" standard were applicable, the court would find that the plaintiffs have not prevailed in the first count.
 II.
The second count alleges that the plaintiffs purchased the business as a restaurant business and that the defendants represented it "as such in every manner." It relies upon #4(e) of the "asset purchase and sale agreement" (Ex. A) which imposes liability on the seller not only for false statement of material fact but also for failing "to state a material fact necessary to make the statements contained therein not misleading." This paragraph of the agreement, however, refers only to a "representation or warranty by the seller in this agreement" or "any statement or certificate furnished or to be furnished by the buyer pursuant hereto, or in connection with transactions contemplated hereby." The misrepresentations alleged, however, are not contained in any such writing, but are claimed to have been made orally during the meeting of the parties prior to the execution of the purchase agreement (Ex. A) at the closing.
CT Page 8844 Although it is doubtful that #4(e) of the agreement is applicable to representations not contained in the written agreement, it is not necessary to resolve that question. The court has concluded that no representation was made by the defendants that the store had been used or could be used for a restaurant business. The certificate of occupancy ban on consumption of food on the premises, of which the plaintiffs received notice, precludes any such operation. Apparently the sole basis for claiming that a representation was made that a restaurant could be operated on the premises is the presence of the tables and chairs in the front part of the store. The court, however, credits the testimony offered by the defendants that no use of the tables and chairs for eating on the premises was permitted and that the plaintiffs were so informed.
The second count also recites #6 of the agreement, which declares: "To the best knowledge of the sellers, there are no citations or notices of uncorrected health, or zoning code violations pending or threatened with respect to the business." The only violation claimed in the second count is that "the defendant was not permitted to operate the business as a restaurant business, which violation was well known to the defendant." Again, the court has found from the evidence that the store was never operated as a restaurant. Bell, the zoning official, testified that in his several visits to the store he never observed any consumption of food on the premises. Although he saw the tables and chairs and inquired about their use, he was apparently satisfied with Joseph Capenera's explanation that those items were only for sale. There is no evidence of any notice or citation concerning use of the store as a restaurant. A fortiori, there is no evidence that the sellers were aware of such a notice or citation.
The plaintiffs cannot prevail on the second count of breach of contract.
 III
The third count incorporates the entire second count, which alleges a violation of a representation concerning the use of the premises as a restaurant. In addition it CT Page 8845 recites #10(a) of the agreement, which requires the seller to indemnify the buyers against any loss, including attorney's fees, arising out of any breach of the sellers representations or agreements contained in the written agreement or any documents furnished pursuant thereto or any inaccuracies or omissions in such writings. Again, it is unnecessary to decide whether this paragraph applies to matters not set forth in writing. The court, having found no breach of the provisions of the agreement relied on in the second count with respect to the claimed use of the premises for a restaurant, also rejects the plaintiffs' claim for indemnification in the third count, which is predicated on the existence of the breaches of contract alleged in the second count.
Judgment is rendered for the defendants.
DAVID M. SHEA STATE TRIAL REFEREE